C. Seth Ensign [14635]
Christina Petria [19047]
OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
15 W. South Temple, Suite 950
Salt Lake City, Utah 84101
Telephone: 801.658.6100
Facsimile:  385.360.1707
seth.ensign@ogletree.com
christina.petria@ogletree.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## NORTHERN DIVISION

| | |
|---|---|
| ELWOOD STAFFING SERVICES, INC., a foreign corporation,<br><br>   Plaintiff,<br>v.<br><br>ASHLEY DECARO, an individual; JENNA DAGUE, an individual; TRAFFIC FLAGGING SERVICES, LLC, a limited liability company.<br><br>   Defendants. | **PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiff Elwood Staffing Services, Inc. ("Elwood" or "Plaintiff"), through its undersigned counsel, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., hereby asserts the following claims for injunctive relief and damages against Defendants Ashley DeCaro ("DeCaro"), Jenna Dague ("Dague"), and Traffic Flagging Services, LLC ("TFS").

## NATURE OF ACTION

1.     This action arises from a coordinated misconduct between Defendants DeCaro, Dague, and TFS in breaching and interfering with Elwood's contractual rights and unlawfully diverting Elwood's clients, employees, and goodwill for their own benefit.

2.     Defendants DeCaro and Dague both entered into valid and enforceable non-competition, non-solicitation, and confidentiality agreements with Elwood.

3.     While working as a Branch Manager for Elwood's Ogden, Utah office, DeCaro was entrusted with Elwood's most valuable assets, including client relationships, pricing and contract terms, internal lists, and records reflecting performance and certification of Elwood's trained flaggers. As the main client contact for the branch, DeCaro developed significant working relationships with Elwood's clients. While posing as a loyal employee, DeCaro systematically prepared to unfairly compete with Elwood by essentially learning Elwood's "playbook" in conducting its business and developing relationships with Elwood's customers. Then, DeCaro used all the information, connections, reputation, and documents she improperly took from Elwood to divert major clients from Elwood, taking more than half of Elwood's top-performing certified flaggers to work for TFS.

4.     Similarly, while working as a Senior Staffing Recruiter for Elwood's Ogden, Utah office, Dague was mainly responsible for sourcing and recruiting flaggers and placing certified flaggers with Elwood's client companies to ensure coverage for projects, as discussed more fully below. Dague and DeCaro were both key contacts for Elwood's Ogden area clients.

5.     After resigning from Elwood, DeCaro and Dague both assumed roles with TFS that are substantially similar to the roles they had been performing at Elwood. DeCaro and Dague interfered with Elwood's business relations by, among other things, wrongfully soliciting

Elwood's clients and employees, all in direct violation of their contractual obligations to Elwood, including straightforward non-solicitation and non-compete obligations.

6.      Defendants' breaches and misconduct are deliberate, ongoing, and in direct violation of their contractual obligations. Elwood seeks a temporary restraining order, preliminary injunction, and a permanent injunction, compensatory damages, and other relief against Defendants.

## PARTIES

7.      Elwood is an Indiana corporation with its principal place of business at 4111 Central Avenue, Columbus, IN. Elwood is licensed and authorized to do business, and does business, in Utah, and has multiple Utah offices.

8.      Defendant Ashley DeCaro, formerly known as Ashley Zorko, is an individual who resides in Davis County, State of Utah.

9.      Defendant Jenna Dague is an individual who resides in Davis County, State of Utah.

10.      Defendant Traffic Flagging Services, LLC is a limited liability company with its principal place of business located in Plain City, UT. Upon information and belief, TFS is a closely held company with no members who reside outside of Utah. Ashley DeCaro is listed as TFS's Governing Person.

## JURISDICTION AND VENUE

11.      This action seeks to enforce Defendants DeCaro's and Dague's contractual and legal obligations to Elwood and to remedy Defendants' violations of applicable law.

12.      This Court has personal jurisdiction over Defendants because they (a) reside in the State of Utah; and (b) committed wrongful acts and omissions as described herein, with resulting injury, damages, loss or other consequences in, among other locations, the State of Utah.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs because the value of the injunctive relief sought exceeds $75,000, the amount of damages Elwood will suffer if the requested injunction is not issued exceeds $75,000, and the amount of damages Elwood has already suffered as a result of Defendants' actions as alleged herein exceeds $75,000.

14. Venue is proper in this Court under 28 U.S.C. § 1391(a) because the events giving rise to this claim occurred in this district and because all Defendants reside in this district.

## FACTUAL BACKGROUND AND ALLEGATIONS

### A. Elwood's Business Model and Confidential Information.

15. Elwood is a leading provider of talent-based solutions and actionable workforce intelligence. With offices nationwide, a broad portfolio of services, and an experienced team, Elwood supports its clients through the entire employment life cycle, from attraction to retention of client.

16. Elwood serves clients across a wide range of industries. Its Ogden, Utah office primarily focuses on the flagging industry, supplying certified flaggers for various clients and projects. These flaggers play a critical role in ensuring the safety of construction workers and the public by managing the flow of vehicles and pedestrians using hand signals and other visual cues to direct traffic around construction sites, roadwork, or other situations requiring temporary traffic management.

17. Beyond supplying flagging personnel, Elwood invests significant resources to recruit, train, and certify flaggers, ensuring they meet all current regulatory requirements. These

investments are critical to maintaining the quality, reliability, and reputation of Elwood's workforce for its clients.

18.     Elwood maintains long-standing relationships with its clients, built through consistent service, workforce reliability, and the company's substantial investment in training and certifying its flaggers.

19.     Elwood holds a dominant position in the Ogden flagging market, serving major accounts that rely heavily on Elwood for their staffing needs.

**B. DeCaro and Dague's Employment with Elwood, and Non-Competition, Non-Solicitation, and Confidentiality Agreements.**

20.     Elwood initially hired DeCaro as a Staffing Recruiter for Elwood's Layton, Utah branch on August 10, 2020, and subsequently promoted her around May 2021 to serve as Branch Manager of its Ogden office.

21.     In her role as Branch Manager, DeCaro was entrusted with access to Elwood's confidential and proprietary information. She negotiated bids on Elwood's behalf and managed and developed personnel. She also had direct access to these accounts and played a central role in managing client relationships, overseeing the deployment of trained personnel, and maintaining Elwood's competitive advantage in the region.

22.     In her client-facing position, DeCaro also developed significant working relationships with Elwood's clients. She obtained detailed knowledge of client bill rates and employee pay rates, which she negotiated on Elwood's behalf. She was privy to specifics regarding client operations, ongoing and upcoming projects, and the organizational leadership structures of client companies. This information is highly sensitive and could be exploited by a competitor to directly compete with Elwood and divert significant business.

23.    Elwood also hired Dague as a Senior Staffing Recruiter on June 6, 2022. In her position, Dague had the following responsibilities: sourcing and recruiting flaggers; placing certified flaggers with Elwood's client companies to ensure coverage for projects; acting as liaison between flaggers and Elwood management; and maintaining candidate pools to allow for quick response to client staffing needs. Dague also regularly interacted with Elwood's clients and taking care of their placement needs. Indeed, both DeCaro and Dague functioned as the key contacts for flagging placements needs for all of Elwood's Ogden-area clients.

24.    As a condition of continued employment, DeCaro and Dague both entered into Non-Compete, Non-Solicitation & Confidentiality Agreements (the "Agreements," or, referenced individually, the "Agreement") with Elwood, attached as **Exhibits 1 and 2.**[1]

25.    DeCaro entered into her Agreement with Elwood on August 10, 2020, while Dague executed her Agreement on June 6, 2022.

26.    DeCaro's and Dague's Agreements contain identical provisions concerning their confidentiality, non-competition, and non-solicitation obligations owed to Elwood.

27.    Provision 1 of both Agreements provides:

> **1. Confidentiality.** Employee recognizes that, because of the highly specialized nature of Company's business. Employee will, during Employee's course of employment, obtain, create, and/or be provided access to certain valuable, proprietary and/or confidential information developed, compiled, or utilized by Company in its business which is not known to Company's competitors or to the general public and which is subject to Company's efforts to keep said information confidential. ("Confidential Information"). Employee shall at no time, while employed by Company or anytime thereafter, disclose any Confidential Information to any third party, for the benefit of any third party, or for the Employee's own personal gain, without the prior written consent of Company, except as required in the course of employment with Company. A non-exhaustive list of information that Company deems to be Confirmation Information is attached hereto as Exhibit A and is fully incorporated as if set forth fully herein. All confidential Information is and shall remain Company's exclusive property and shall not be used or retained by Employee except as

---

[1] DeCaro signed the Agreement under her previously used last name, Zorko.

required in the court of Employee's employment with Company. Upon termination of employment or at Company's request at any time, all such Confidential Information in Employee's possession shall be returned to Company. Employee agrees not to destroy any Company's Confidential Information or property.

Exs. 1 and 2, ¶ 1.

28.     Exhibit A of the Agreements defines "Confidential Information" in the following

manner:

Information, documentation, personal property and all files, records, lists, specifications, documents, electronic information, e-mails, database information software, and equipment obtained, received, accessed, learned, and/or acquired by Employee while employed by Company, including information conceived, originated, discovered, or developed by or shared with Employee, in any format whatsoever whether tangible, intangible or electronic, during the time of employment or affiliation with Company, including, but not in any way limited to:

Any information or documentation which constitutes a trade secret as defined by applicable state and/or federal law, regulation, statute or rule'

Client lists, including, without limitation, names, contact information, needs, habits, preferences, practices, idiosyncrasies, credit information, billing information, purchasing and usage information, or other client specific information;

Internal employee lists and temporary employee lists, including, without limitation, employee performance history, pay history, personal information, skill sets, suitability of the employees, and addresses and contact information compiled by Company…

See id., Exhibit A.

29.     Under Provision 2 of the Agreements, DeCaro and Dague acknowledged and

agreed that the non-solicitation and non-compete restrictive covenants are reasonably necessary to

protect Elwood's goodwill and Confidential Information. Exs. 1 and 2, ¶ 2. Additionally, DeCaro

and Dague agreed to the following non-solicitation restrictions:

In order to protect Company's goodwill, as well as its Confidential Information, Employee agrees that Employee will not, for a period of One (1) year immediately following separation of Employee's employment with Company, directly or

indirectly, on Employee's behalf of any third party as an employee, agent, consult, or in any other capacity: (a) solicit Company's clients with whom Employee had contact with or responsibility for in the Three (3) years immediately preceding Employee's separation from Company' (b) solicit third parties which Company has approached about becoming a client of Company in the One (1) year immediately preceding Employee's separation from Company; or (c) solicit or encourage any employee, who is employed at the time of Employee's separation from the Company, to leave the employ of Company.

Exs. 1 and 2, ¶ 2.

30.     Under Provision 3 of the Agreements, DeCaro and Dague acknowledged and agreed to the following non-competition restrictions:

In order to protect Company's goodwill, as well as its Confidential Information, Employee agrees that Employee will not, for a period of One (1) year immediately following separation of Employee's employment with Company, directly or indirectly, on Employee's behalf of any third party as an employee, agent, consult, or in any other capacity, engage in a business similar to Company's and in a capacity and/or role that is substantially similar to the capacity and/or role within which Employee performed services for Company in the Three (3) years preceding Employee's separation of employment with Company. The non-compete obligation contained in this Paragraph 3 shall be geographically limited to Seventy-Five (75) miles from any branch or on-site location at which Employee performed services for Company. Employee further agrees that for a period of One (1) year immediately following separation of Employee's employment with Company, Employee shall not seek or accept permanent or part-time employment, in a capacity and/or role that is substantially similar to the capacity and/or role within which Employee performed services for Company, with an Company client with whom Employee had contact with or responsibility for in the Three (3) years immediately preceding Employee's separation from Company.

Exs. 1 and 2, ¶ 3.

31.     The restrictive covenants contained in the Agreements are reasonable and enforceable. The non-solicitation restrictive covenant contains a one-year limitation post-termination and is limited to the customers with whom DeCaro or Dague had contact with or responsibility for in the three years before their termination or resignation. Similarly, the non-competition restrictive covenant is enforceable because it contains a one-year limitation, a reasonable geographical limitation (75 miles from any branch at which DeCaro or Dague worked),

and a reasonable scope (limited to their work for a competitor in a substantially similar position as their Elwood position).

**C.  DeCaro's Creation of a Competing Business, Relying on Elwood's Resources.**

32.    On June 11, 2025, at 8:30 pm, DeCaro tendered her resignation from Elwood effective June 18, 2025.

33.    Elwood was not aware of Defendants' wrongful competition before DeCaro resigned. Elwood only recently learned that DeCaro, *while* employed with Elwood, also provided recruiting services to another company, in direct competition with Elwood. Specifically, a client recently informed Elwood that in 2024, for about three to four weeks, DeCaro worked as a recruiter for that client, while serving as Branch Manager for Elwood. During the same time period, DeCaro routinely requested time off for personal reasons—requests Elwood granted readily, unaware that DeCaro was using the time for competing activities.

34.    In its investigation, Elwood discovered DeCaro had been preparing to use not only the information, relationships, and expertise she developed at Elwood to compete with Elwood, but also blatantly use Elwood's own proprietary information and documents to develop her business.

35.    While working for Elwood, ostensibly as a loyal employee, DeCaro formed and began operating TFS, a business in direct competition with Elwood. Specifically, TFS was formed on January 19, 2024. *See* **Exhibit 3, Formation Documents.** DeCaro is listed as the "Governing Person" for the company. *See id.*

36.    TFS operates in Plain City, Utah and the Ogden, Utah area—within only a few miles of the same location where DeCaro and Dague worked for Elwood.  *See id.*

37.    Elwood recently discovered that DeCaro was using her Elwood-issued computer to complete work for her own personal business.

38.     Specifically, on May 28, 2025, DeCaro sent at least 17 Excel spreadsheets from her Elwood email address to her TFS email address. These spreadsheets contained internal employee information and temporary lists of flaggers who had previously completed flagging certification trainings under DeCaro's supervision.

39.     Under DeCaro's Agreement, these lists constitute Confidential Information.

40.     On June 4, 2025, in an email entitled "W9," DeCaro sent multiple documents with the title "New Vendor Requests Form" from her Elwood work email to what appears to be her TFS email address (ashley@trafficflaggingservices.com). These documents, completed by DeCaro on behalf of TFS and dated June 4, 2024, reflect DeCaro's attempt to register TFS as a vendor for one of Elwood's longstanding clients.

41.     On June 10, 2025, DeCaro forwarded to her TFS email address an email from a client, containing the client's contact information, with the apparent purpose of securing future business.

42.     On the same day, DeCaro also forwarded to her TFS email address an email from a client containing the client's insurance clause and policy.

43.     On June 12, 2025, DeCaro forwarded to her TFS email address an email containing Elwood's Client Services Agreement with a client. The email and attached agreement contained the client's specific needs and agreed terms of the contract, including the needed positions and rates, direct placement fees, and other requirements for the requested flaggers—information proprietary to Elwood and critical to its client relationships.

44.     Upon information and belief, DeCaro has taken all of the hard copies of flagging certifications upon her departure from Elwood.

D.  **The Individual Defendants' Continual Breach of Contractual Obligations to Elwood and Wrongful Conduct.**

45.     After effectively developing her own business using Elwood's practices, information, documents, and client relationships, DeCaro, directly and through TFS, is now competing with Elwood and soliciting its clients and workforce, in violation of the Agreement.

46.     DeCaro continues to breach her non-competition obligations to Elwood by operating TFS, a competitor to Elwood, offering substantially similar services by providing certified staffers to largely the same clients DeCaro serviced at Elwood, within 75 miles of DeCaro's place of employment with Elwood, and during the restricted period.

47.     Despite her contractual obligations to Elwood, DeCaro has solicited Elwood employees, in violation of her non-solicitation covenants.

48.     On June 23, 2025, only days after DeCaro's resignation, Dague also tendered her resignation. Upon information and belief, TFS and DeCaro solicited Dague to join TFS as a recruiter, performing for TFS the same or substantially similar work that Dague had previously performed for Elwood.

49.     Additionally, on the morning of June 23, 2025, DeCaro contacted an Elwood associate via text, identifying herself as "Ashley," and stating she had obtained the employee's phone number through another flagger.

50.     DeCaro then solicited this Elwood associate to work for TFS, acknowledging that she runs a business providing seasonal workers and flaggers to clients.

51.     In a follow-up message at approximately 1:00 pm, DeCaro claimed that her business is not a staffing agency, but a "service company."

52.     In reality, DeCaro operates a business substantially similar to Elwood's and performs managerial functions akin to her former role as Branch Manager for Elwood. Similarly,

upon information and belief, Dague also performs recruiting functions that are the same or substantially similar to the work she did as a Recruiter for Elwood.

53.    Since DeCaro's and Dague's resignations, Defendants have wrongfully solicited and diverted multiple Elwood clients and certified flaggers, in direct violation of DeCaro's and Dague's contractual obligations.

54.    Defendants have also solicited and/or placed Elwood associates to perform work for multiple Elwood clients for the financial benefit of Defendants, using Elwood's confidential and proprietary information that Defendants knew had been wrongfully taken from Elwood in violation of contractual and common law duties.

55.    Following the individual Defendants' resignations, DeCaro, Dague, and TFS have diverted Elwood's business with an important Elwood client (Client 1) with whom DeCaro worked extensively, in direct competition with Elwood. Prior to this diversion, the relationship between Elwood and this client generated substantial revenue for Elwood—approximately $1 million in 2024. By wrongfully diverting this business, Defendants not only breached their obligations to Elwood but also caused Elwood significant financial harm.

56.    Similarly, Elwood has maintained a business relationship with one of the largest general contractors in both Utah and the United States (Client 2) for over 30 years.

57.    During her tenure as Branch Manager for Elwood, DeCaro cultivated a close working relationship with Client 2 representatives and regularly conducted business with this client on behalf of Elwood.

58.    On July 23, 2025, approximately five weeks after DeCaro's resignation, a representative from Client 2 informed Elwood's Regional Vice President, David Stryker (who had also worked alongside DeCaro in the Ogden office) that Client 2 had decided to transfer all of its

flagging services business in Ogden from Elwood to DeCaro's competing company, TFS. This further jeopardized Elwood's National Contract with Client 2 and poses a substantial risk of adverse company-wide operational and financial consequences across all Elwood's branches.

59.     Defendants also diverted business from another Elwood client (Client 3) who started using services from TFS.

60.     Elwood has identified two other clients, Client 4 and Client 5, whose business has been wrongfully diverted by Defendants.

61.     Elwood continues to investigate and has as yet been unable to assess the full extent of lost business, clients, workforce, and goodwill that it is suffering due to Defendants' wrongful competition.

62.     DeCaro and Dague continue to breach their contractual obligations, and all Defendants continue to interfere with Elwood's business relations. Plaintiff has learned of multiple other flaggers who have been taken by Defendants in direct competition with Plaintiff. Elwood estimates it has lost over 50% of the flaggers it was regularly providing to its clients due to Defendants' actions. Elwood continues to receive reports of additional misconduct by Defendants, as well as DeCaro's and Dague's blatant disregard of their contractual obligations to Elwood.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**
**(Breach of Contract – Against Defendant DeCaro)**

63.     Elwood incorporates by reference the allegations contained in Paragraphs 1 through 62 as if fully set forth herein.

64.     As part of DeCaro's Agreement (Ex. 1), she entered into valid and enforceable contractual terms providing, *inter alia*, that she (1) would not, either directly or indirectly, disclose or use Elwood's confidential, proprietary, or trade secret information; (2) would not solicit

Elwood's clients or employees for one year after her employment's termination; and (3) would not compete with Elwood for one year after her employment's termination in a substantially similar position.

65.     DeCaro received adequate and sufficient consideration for entering into the Agreement, including employment and/or continued employment with Elwood, access to Elwood's Confidential Information, and training on Elwood's business methods, strategies, expertise, and other means of success.

66.     The confidentiality, non-competition, and non-solicitation provisions in the Agreement are reasonable in scope and duration, and necessary to protect Elwood's legitimate business interests.

67.     Elwood fulfilled all of its obligations under the Agreement.

68.     Upon information and belief, DeCaro breached the Agreement's provisions, including the enforceable restrictive covenants, by competing with Elwood within the restricted period and geographical area, soliciting Elwood's employees and clients, and disclosing and/or using Elwood's confidential information without authorization.

69.     In agreeing to the Agreement, DeCaro expressly acknowledged that breaches of certain of the above provisions will irreparably damage Elwood for which monetary damages may not be an adequate remedy.

70.     DeCaro's breaches have caused, and will continue to cause, irreparable harm to Elwood in ways that cannot be reasonably ascertained or quantified and for which monetary damages are not an adequate remedy.

71.     DeCaro's breaches have also caused, and will continue to cause, damages to Elwood in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Against Defendant Dague)

72.     Elwood incorporates by reference the allegations contained in Paragraphs 1 through 71 as if fully set forth herein.

73.     As part of Dague's Agreement (Ex. 2), she entered into valid and enforceable contractual terms providing, *inter alia*, that she (1) would not, either directly or indirectly, disclose or use Elwood's confidential, proprietary, or trade secret information; (2) would not solicit Elwood's clients or employees for one year after her employment's termination; and (3) would not compete with Elwood for one year after her employment's termination in a substantially similar position.

74.     Dague received adequate and sufficient consideration for entering into the Agreement, including, employment and/or continued employment with Elwood, access to Elwood's Confidential Information, and training on Elwood's business methods, strategies, expertise, and other means of success.

75.     The confidentiality, non-competition, and non-solicitation provisions in the Agreement are reasonable in scope and duration, and necessary to protect Elwood's legitimate business interests.

76.     Elwood fulfilled all of its obligations under the Agreement.

77.     Upon information and belief, Dague breached her Agreement's provisions, including the enforceable restrictive covenants, by competing with Elwood within the restricted period and geographical area and soliciting Elwood's employees and clients.

78.     In agreeing to her Agreement, Dague expressly acknowledged that breaches of certain of the above provisions will irreparably damage Elwood for which monetary damages may not be an adequate remedy.

79.     Dague's breaches have caused, and will continue to cause, irreparable harm to Elwood in ways that cannot be reasonably ascertained or quantified and for which monetary damages are not an adequate remedy.

80.     Dague's breaches have also caused, and will continue to cause, damages to Elwood in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**(Tortious Interference with Contract – Against Defendant TFS (DeCaro Contract))**

81.     Elwood incorporates by reference the allegations contained in Paragraphs 1 through 80 as if fully set forth herein.

82.     To establish tortious interference with contract, Elwood must show (i) the existence of a valid contractual relationship, (ii) TFS's knowledge of the relationship, (iii) TFS's intentional interference in inducing or causing a breach, (iv) the impropriety of TFS's interference, and (v) resulting damages. All elements are met here.

83.     Elwood entered into a valid and binding Agreement with DeCaro that contains enforceable restrictive covenants.

84.     TFS had knowledge of the contractual relationship between Elwood and DeCaro because DeCaro is both an employee and governing person for TFS.

85.     TFS intentionally interfered with the Agreement and caused DeCaro to breach her non-competition, non-solicitation, and confidentiality obligations to Elwood.

86.     TFS carried out its intentional interference through improper means, including but not limited to the use of Elwood's confidential and proprietary information that TFS knew had been wrongfully taken in violation of contractual and common law duties.

87. Upon information and belief, TFS is using Elwood's Confidential Information to unfairly and wrongfully compete with Elwood and solicit Elwood's clients and employees, inducing DeCaro's breaches of her Agreement with Elwood.

88. TFS's intentional interference with Elwood's contract with DeCaro has caused, and will continue to cause, irreparable harm to Elwood in ways that cannot be reasonably ascertained or quantified and for which monetary damages are not an adequate remedy.

89. TFS's conduct has also caused, and will continue to cause, damages to Elwood in an amount to be proven at trial.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Tortious Interference with Contract – Against Defendant TFS and DeCaro (Dague Contract))**

90. Elwood incorporates by reference the allegations contained in Paragraphs 1 through 89 as if fully set forth herein.

91. To establish tortious interference with contract, Elwood must show (i) the existence of a valid contractual relationship, (ii) TFS and DeCaro's knowledge of the relationship, (iii) TFS and DeCaro's intentional interference in inducing or causing a breach, (iv) the impropriety of that interference, and (v) resulting damages. All elements are met here.

92. Elwood entered into a valid and binding Agreement with Dague that contains enforceable restrictive covenants.

93. TFS and DeCaro had knowledge of the contractual relationship between Elwood and Dague because TFS employed and solicited Dague to join TFS and compete with Elwood. Specifically, as a principal of TFS and former employee of Elwood, DeCaro knew that Dague owed the same contractual obligations to Elwood that DeCaro herself owed to Elwood.

94.     TFS and DeCaro intentionally interfered with Dague's Agreement with Elwood, causing her to breach her non-competition, non-solicitation, and confidentiality obligations to Elwood.

95.     TFS and DeCaro carried out their intentional interference through improper means, including but not limited to the use of Elwood's confidential and proprietary information that TFS and DeCaro knew had been wrongfully taken in violation of contractual and common law duties.

96.     Upon information and belief, TFS is using Elwood's Confidential Information to unfairly and wrongfully compete with Elwood and solicit Elwood's clients and employees, inducing Dague's breaches of her Agreement with Elwood.

97.     TFS's and DeCaro's intentional interference with Elwood's contract with Dague has caused, and will continue to cause, irreparable harm to Elwood in ways that cannot be reasonably ascertained or quantified and for which monetary damages are not an adequate remedy.

98.     TFS's and DeCaro's conduct has also caused, and will continue to cause, damages to Elwood in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference with Current and Prospective Business**
**Relations – Against All Defendants)**

99.     Elwood incorporates by reference the allegations contained in Paragraphs 1 through 98 as if fully set forth herein.

100.    Elwood enjoyed existing business relationships with its clients (including Clients 1-5) and employees.

101.    Defendants were aware of those relationships and specifically engaged in wrongful competition, solicitation, and disclosure of confidential information to interfere with Elwood's relations.

102.    Upon information and belief, Defendants continue to interfere with Elwood's relations with clients and employees through improper means, specifically including but not limited to the use of Elwood's confidential and proprietary information that Defendants knew had been wrongfully taken in violation of contractual and common law duties.

103.    As a direct and proximate result of Defendants' tortious interference, Elwood has suffered economic harm including, but not limited to, lost profits and business disruption in an amount to be proven at trial.

104.    Defendants' conduct was willful, intentional, and performed in reckless disregard of Elwood's rights, causing significant harm to Elwood for which Elwood seeks compensatory and punitive damages in an amount to be determined at trial.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Civil Conspiracy – Against All Defendants)**

105.    Elwood incorporates by reference the allegations contained in Paragraphs 1 through 104 as if fully set forth herein.

106.    Defendants were members of a common conspiracy. The object of the conspiracy was to accomplish unlawful purposes, including to steal and continuously misuse Elwood's confidential and proprietary information and to interfere with Elwood's business relations.

107.    Defendants had a meeting of the minds to engage in the course of action described above in order to further the business of TFS and to harm Elwood's economic interests.

108.    As described above in detail, Defendants committed the overt acts of breach of contract and intentional interference with contract and business relations.

109.    Defendants' conspiracy has proximately caused injury to Elwood for which Elwood seeks to recover compensatory and consequential damages.

## PRAYER FOR RELIEF

Elwood respectfully requests the following relief:

a.  The entry of judgment in favor of Plaintiff and against Defendants.

b.  A permanent injunction:

   i.   Enjoining Defendants DeCaro and Dague from directly or indirectly engaging in a business similar to Elwood's and in a capacity and/or role substantially similar to their roles at Elwood for a period of one-year following entry of the injunction within the Agreements' geographical limitation;

   ii.  Enjoining Defendants DeCaro and Dague from, directly or indirectly, soliciting Elwood's clients with whom they had contact or responsibility for in the three years preceding their resignations and soliciting or encouraging any employees of Elwood to leave Elwood for a period of one-year following entry of the injunction;

   iii. Enjoining Defendants from disclosing, using, or distributing any of Elwood's confidential information, including client and employee lists.

   iv.  Compelling Defendants DeCaro and Dague to comply with their contractual obligations to Elwood as identified in their respective Agreements;

   v.   Requiring Defendants to immediately cease doing business with all business relations that they learned of while employed by Elwood, and are currently doing business with, or have attempted to do business with;

   vi.  Refraining from any spoliation of evidence; and

   vii. Extending the term of Defendants DeCaro and Dague's obligations under their respective Agreements until at least the conclusion of this lawsuit and potentially longer as equity requires.

c.  Judgment against Defendant DeCaro for breach of contract.

d.  Judgment against Defendant Dague for breach of contract.

e.  Judgment against Defendant TFS for tortious interference with contract of DeCaro.

f.      Judgment against Defendants TFS and DeCaro for tortious interference with contract of Dague.

g.      Judgment against all Defendants for tortious interference with current and prospective business relations.

h.      Judgment against all Defendants for civil conspiracy.

i.      Compensatory damages in the form of lost profits to Elwood resulting from Defendants' breaches and misconduct.

j.      An award of pre- and post-judgment interest, costs, and attorney's fees as allowed by law.

k.      Such further relief as the Court deems just and proper to prevent further harm to Elwood.

 DATED this 29th day of August, 2025.

OGLETREE DEAKINS, NASH, SMOAK &
STEWART, P.C.

*/s/  Christina Petria*
C. Seth Ensign
Christina Petria
Attorneys for Plaintiff

21

92230092.v1-OGLETREE

## <u>VERIFICATION</u>

I declare that the matters stated in the above Verified Complaint are within my personal knowledge and/or are based upon my review of the records kept in the regular court of business of Plaintiff Elwood Staffing Services, Inc.'s business. Based upon the information so obtained and compiled, which I believe to be accurate, I believe the facts stated in the foregoing Verified Complaint are true and correct and are based upon a reasonable inquiry. I make this verification to the best of my information and belief. I declare under criminal penalty under the laws of the State of Utah that the foregoing is true and correct to the best of my knowledge.

DAYED this 29th day of August, 2025.

David Stryker
Regional Vice President

.